IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WATERFRONT TECHNOLOGIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-21 |
| ) | Judge Nora Barry Fischer |
| INSCOPE INTERNATIONAL, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

This is a contract dispute concerning the alleged improper disclosure of confidential information, intellectual property, and trade secrets. Plaintiff Waterfront Technologies, Inc. ("Waterfront") asserts four claims against Defendant InScope International, Inc. ("InScope") in connection with alleged disclosures of such information made by Joseph Celano, a former employee of InScope, to another corporation CONXX, Inc. ("CONXX"). (Docket No. 13 at ¶¶ 69-70, 84-88). As a result, CONXX was allegedly awarded a contract with the Port of Pittsburgh Commission ("Port Commission") to develop inland waterway control systems ("Wireless Waterways"), which Waterfront had been pursuing. *Id.* at ¶¶ 87, 89, 90-91.

Pending before the Court is InScope's Motion to Dismiss Amended Complaint, or in the Alternative, to Transfer. (Docket No. 14). InScope seeks to dismiss or stay this action pursuant to the Federal Arbitration Act. In the alternative, it seeks to transfer this case to the Eastern District of Virginia in accordance with 28 U.S.C. § 1404(a). This matter has been fully briefed by the parties and the Court held a motion hearing on May 10, 2013. (Docket Nos. 18; 20; 21; 24; 27; 28; 29; *5/10/13 Hr'g Trans*). After consideration of all of the parties' arguments, the Court denies InScope's Motions for the following reasons.

I.   **The Agreement to Arbitrate is at Issue.**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., provides, in pertinent part, that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save such grounds as exist at law or in equity for the revocation of any contract."[1] 9 U.S.C. § 2. To this end, a district court must "'engage in a limited review to ensure that the dispute is arbitrable.'" *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d. Cir. 1998) (quoting *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990)). A court must therefore make the following threshold determinations: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the specific dispute falls within the scope of that agreement. *Id.* (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 228 (3d Cir. 1998)).

The United States Court of Appeals for the Third Circuit recently articulated a two-step analysis for courts confronted with a dispute as to the validity and scope of an arbitration agreement:

> [W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay. But if the complaint and its supporting documents are unclear regarding the agreement to

---

[1] Upon the "alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration," a party may petition the federal court to enforce the arbitration agreement by "directing that such arbitration proceed in the manner provided in the agreement." 9 U.S.C. § 4. The FAA further provides that if a court is satisfied that the issue before it should be referred to arbitration, upon application of one of the parties, a court shall stay its proceedings until such arbitration has been completed in accordance with the terms of the agreement. 9 U.S.C. § 3. When a party requests a stay of proceedings as part of a motion to compel arbitration, a District Court is obligated to grant the stay if it decides to compel arbitration. *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004). In addition to granting a stay and compelling arbitration where required by the FAA, the court in its discretion may also dismiss the action instead of staying the case "[if] all the claims involved in an action are arbitrable." *Berkery v. Cross Country Bank*, 256 F. Supp. 2d 359, 364 (E.D. Pa. 2003) (citing *Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175, 179 (3d Cir. 1998)).

arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question. After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard. In the event that summary judgment is not warranted because the party opposing arbitration can demonstrate, by means of citations to the record, that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same, as Section 4 of the FAA envisions.

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, No. 12-1170, __ F.3d __, 2013 WL 2302324, at *8 (3d Cir. May 28, 2013) (citations and quotations omitted). The interpretation and construction of arbitration agreements are determined by reference to federal substantive law. *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d Cir. 1999) (citing [*Moses H. Cone, Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25, n.32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)]).

The Amended Complaint references two contracts that were contemporaneously executed on June 16, 2010—the "Mutual Non-Disclosure / Non-Circumvention Agreement" ("ND/NCA") and the "Teaming Agreement." (Docket No. 13 at ¶¶ 17, 20). Both contracts expressly prohibit the improper disclosure of confidential and/or proprietary information.[2] However, only the

---

[2] The ND/NCA defines "Confidential Information" as:

> [A]ny and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products of each of the parties, and includes, without limitation, their respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, business forecasts, sales and merchandising, and marketing plans and information.

3

Teaming Agreement contains a mandatory arbitration provision.[3] (Docket No. 18-1 at ¶ 16.4). Where there are two agreements, only one of which contains an arbitration agreement, the Third Circuit has explained that the ultimate issue is whether the two agreements should be construed as a single integrated agreement. *Battaglia v. McKendry* ("*Battaglia I*"), 233 F.3d 720, 728 (3d Cir. 2000). In *Battaglia I*, the Court of Appeals examined a number of different factors, including, among others, whether the parties to the agreements were the same, whether the agreements were executed concurrently, whether there anti-merger language was present in either agreement, whether the agreements memorialized a single transaction, and whether the agreements contain references to each other. *Id.* at 728-29. On remand and after discovery, the district court in *Battaglia v. McKendry* ("*Battaglia II*") viewed "the purpose of the two Agreements" as the "most compelling evidence" in the integration analysis. *Battaglia II*, No. 98-5321, 2002 WL 253944, at *8 (E.D. Pa. Feb. 20, 2002).

Based on the facts alleged in the Amended Complaint and the supporting documents it

---

(Docket No. 13-1 at ¶1(a)). The ND/NCA prohibited the disclosure of a party's Confidential Information to any other entities, except as necessary "(i) for negotiations discussions, and consultations with personnel or authorized representatives of the other party, (ii) as may be required by a governmental agency or regulatory body …, (iii) and any purpose the other body may hereafter authorize in writing." (*Id.* at ¶ 21). Similarly, the Teaming Agreement prohibited disclosure of "Proprietary Information" subject to essentially the same limitations. (Docket No. 18-1 at ¶ 3.3). The Teaming Agreement broadly defined Proprietary Information as:

> [A]ll information and data relating to the Parties' technology, products, services or other business, in whatever form such information may be disclosed, including, without limitation: (i) product or service information, including designs and specifications, development plans, patent applications, and strategy; (ii) marketing information, including lists of potential or existing customers or suppliers, marketing plans and surveys; (iii) computer software, including codes, flowcharts, algorithms, architectures, menu layouts, routines, report formats, data compilers and assemblers; and (iv) financial information, including sales, pricing and revenue information; and if applicable, (v) Customer programmatic information and information concerning the Project and its contractors.

*Id.* at ¶¶ 3.2.

[3] The Teaming Agreement's mandatory binding arbitration clause applies to "any dispute that may arise between them under this [Teaming] Agreement." (Docket No. 18-1 at ¶ 16.4). Waterfront asserts that its claims do not "arise … under" the Teaming Agreement. (Docket No. 20 at 9). Because InScope's motion to dismiss is denied on other grounds, the Court will not address this argument at this juncture. Waterfront may later raise this argument by way of an appropriate motion following discovery.

references, the Court does not find that arbitration is warranted at this juncture. There are insufficient facts to determine whether the arbitration clause in the Teaming Agreement governs this dispute. As in *Battaglia I*, there are countervailing indications about whether the agreements should be read together. Both the ND/NCA and the Teaming Agreement were entered into contemporaneously. The parties to the agreement are also the same parties that are now before the Court. To the extent that Waterfront argues the Teaming Agreement essentially expired, (Docket No. 29 at 4), the Teaming Agreement provided that the contract was to terminate in one year "[e]xcept as it relates to Proprietary Information." (Docket No. 18-1 at ¶ 4.1). Accordingly, it appears that the Teaming Agreement's protection of Proprietary Information may be perpetual. On the other hand, the agreements do not reference each other. Furthermore, they both contain "Entire Agreement" clauses that suggest each contract is to be read separately.[4] Neither party has been able to explain, based solely on the pleadings, why the two contracts contain these "Entire Agreement" clauses even though both contracts were formed contemporaneously. Most significantly, the Court cannot discern the purpose behind separately entering into the ND/NCA and the Teaming Agreement. The facts, as alleged, are inconclusive as to the independence/inter-dependence of the two agreements under a Rule 12(b)(6) standard. *Battaglia II*, 233 F.3d at 729. The Amended Complaint and its supporting documents are simply unclear regarding the

---

[4] The following "Entire Agreement" clause is found in the ND/NCA:

> **Entire Agreement.** This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed herein and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information.

(Docket No. 13-1 at ¶ 18). The Teaming Agreement contains a very similar "Entire Agreement" clause:

> The foregoing states the entire agreement between the Parties, and supersedes any prior understanding, commitments, or agreements, oral or written, with respect to the subject Project.

(Docket No. 18 at ¶ 16.1). The only significant difference is the inclusion of the term "contemporaneous" in the ND/NCA. The Teaming Agreement only purports to supersede "prior" agreements.

agreement to arbitrate as it pertains to the disclosure of confidential information. *Guidotti*, 2013 WL 2302324, at *8. Therefore, the Court will grant the parties ninety (90) days to conduct limited discovery on whether arbitration should be compelled in this case.

## II.  Transfer of Venue Pursuant to 28 U.S.C. § 1404(a)

Alternatively, Defendant InScope seeks to transfer this action to the Eastern District of Virginia. Pursuant to 28 U.S.C. § 1404(a), a district court may transfer a civil case to another district "[f]or the convenience of the parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Such transfers "are discretionary determinations made for the convenience of the parties and presuppose that the court has jurisdiction and that the case has been brought in the correct forum." *Lafferty v. Gito St. Riel*, 495 F.3d 72, 76, 79 n. 8 (3d Cir.2007). The purpose of § 1404(a) is to protect the parties, witnesses, and the general public against unnecessary inconvenience and expense. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). The party seeking a transfer bears the burden of establishing that the transfer is appropriate and must demonstrate that the alternative forum is adequate and more convenient. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The moving party must show that "on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Id.* (internal quotations omitted).

In *Jumara*, the Third Circuit outlined the private and public factors for the Court to consider in exercising its discretion. *Id.* The relevant private factors to consider include: (1) each party's forum preference; (2) where the claim arose; (3) the convenience of the parties as indicated by their relative physical and financial conditions; (4) the convenience of the witnesses; and, (5) the locations of books and records. *Id.*; *see also In re Amendt*, 169 F. App'x. 93, 96 (3d Cir. 2006) (same). The Court also considers a number of public factors, including: (1)

enforceability of judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and, (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Jumara*, 55 F.3d at 879. Upon consideration of the *Jumara* factors, the Court finds that transferring this case to the Eastern District of Virginia is inappropriate.

### A. Relevant Private Factors

#### 1. Parties Choice of Forum

Waterfront brought this action in this Court, (Docket No. 1), and it opposes transfer. (Docket No. 20, at 12). This Court has recognized that a plaintiff's choice of forum is accorded great weight. *See Kettavong v. Gasbarre Prods, Inc.*, 2007 WL 2728413, at *2 (W.D. Pa. Sept. 17, 2007) (Fischer, J.). However, Waterfront is a Maryland corporation that maintains its principal place of business in Baltimore. (Docket No. 13, at ¶ 4). A plaintiff's choice of forum is given less deference where the plaintiff chooses to sue in a forum outside his or her state of residence. *See, e.g.*, *Samsung SDI Co., Ltd. v. Matsushita Elec. Indus. Co.*, 524 F. Supp. 2d 628, 631 (W.D. Pa. 2006) (Ambrose, J.). In addition, the Court must also consider InScope's preference to transfer this case to the Eastern District of Virginia. *Jumara*, 55 F.3d at 879. In this Court's estimation, this factor is neutral and does not favor either party.

#### 2. Locus of Origin of Claims

The Court also considers "whether the claim arose elsewhere." *Jumara*, 55 F.3d at 879. This is a separate consideration from the convenience of the parties and focuses on where the alleged wrongful activity or other activities relevant to the claims at issue took place. Courts have recognized that for purposes of analyzing a motion to transfer, the place of performance is

where the claim for breach of contract arose. *See Stillwagon v. Innsbrook Golf & Marina, LLC*, 2013 WL 1180312, at *26 (W.D. Pa. Mar. 20, 2013) (Hornak, J.) (citing *J.L. Clark Mfg. Co. v. Gold Bond Corp.*, 629 F. Supp. 788, 791 (E.D. Pa. 1985)).

As a background matter, it appears there are three relevant contracts at issue: the ND/NCA, the Teaming Agreement, and the Cooperative Reseach and Development Agreement ("CRADA"). Both the ND/NCA and Teaming Agreement were executed in anticipation of negotiations with the Space and Naval Warfare Systems Center Pacific ("SSC Pacific"). (Docket No. 13 at ¶¶ 17-18, 20, 29). In accordance with the CRADA that was later executed between Waterfront, InScope, and SSC Pacific, the parties were to explore common business interests, develop new technology, and market their joint capabilities to governmental and business entities. *Id.* at ¶¶ 29-30. They then targeted the Port Commission as a client with an eye toward developing the Wireless Waterways in Pittsburgh. *Id.* at ¶¶ 32, 34-36. The subject claims arose when InScope allegedly authorized a former employee, Mr. Celano, to disclose Waterfront's confidential information to CONXX. *Id.* at ¶¶ 68-70, 84-89. As a result, CONXX was able to win the Port Commission contract, cutting Waterfront out of the deal. *Id.* at ¶¶ 89-92.

In this Court's estimation, this *Jumara* factor does not weigh in favor or against transfer. The ND/NCA and Teaming Agreement prohibit the parties from disclosing confidential and/or proprietary information. The "performance" of the duty to refrain from disclosing such information is not limited to a particular location. Neither contract contains any reference to geographic parameters. (*See* Docket No. 13-1; Docket No. 18-1). Given that the parties have nationwide operations, the performance of both contracts can be said to be nationwide in scope. Thus, it is equally true that the breach of contract claims arose in the Western District of Pennsylvania as they did in the Eastern District of Virginia.

### 3. Relative Convenience of the Parties

The Court further finds that the relative convenience of the parties does not tend to favor retaining or transferring this action to the Eastern District of Virginia. Neither party is a resident of the Western District of Pennsylvania. Nevertheless, Waterfront has represented it is prepared to litigate before this Court. (Docket No. 20 at 15). InScope contends that, as an organization owned by employees, veterans, and minorities, it does not have the financial wherewithal to defend its legal interests in this District. (Docket No. 21 at 12). During the motion hearing, however, Waterfront pointed out that InScope was one of the largest black-owned businesses with revenue of $33 million. *5/10/13 Hr'g Trans.* at 53. In this Court's estimation, it does not seem that litigating in this forum would be unduly onerous for either party.

### 4. Convenience of Witnesses

The convenience of the witnesses is a separate consideration from that of the parties. Since "party witnesses are presumed to be willing to testify in either forum despite any inconvenience ... [t]he convenience of the non-party witnesses is the main focus" of this factor. *Hillard v. Guidant Corp.*, 76 F.Supp. 2d 566, 570 (M.D. Pa. 1999). The Court, therefore, confines its analysis to the convenience of the non-party witnesses and considers this factor "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879 (emphasis added).

Based on the information provided by the parties, the Court finds that convenience of non-party witnesses favors retaining this action in this forum. There are a number of non-party individuals who could become witnesses: (1) personnel for the Port Commission; (2) CONXX employees; (3) employees with Scientel;[5] (4) SSC Pacific officials; and, (5) Mr. Celano. It is

---

[5] Waterfront identified Scientel Wireless Inc. as a networking technology company that the Port Commission believed was competent to participate in the construction of the Wireless Waterways project. (Docket

9

undisputed that personnel for the Port Commission are located in the Pittsburgh area. CONXX personnel should also be present in and around Western District of Pennsylvania given that it ultimately won the prime contract to develop the Wireless Waterways. (Docket No. 13 at ¶ 87). Employees with Scientel, a non-party that may have knowledge about the facts of this case, may be located in this District. (Docket No. 20 at 15). While SSC Pacific officials and Mr. Celano are located in San Diego, California, (Docket No. 21 at 12-13), it would not be more convenient for them if the action was transferred to the Eastern District of Virginia.

### 5. Locations of Books and Records

*Jumara* directs the Court to consider "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Jumara*, 55 F.3d at 879. Waterfront argues that there is no reason why books and records cannot be produced in this District and believes that much of the discovery will be exchanged electronically. (Docket No. 20 at 16). Therefore, this factor neither favors nor disfavors transfer.

## B. Relevant Public Factors

### 1. Relative Docket Congestion

According to the Federal Court Management Statistics, there were 3,205 filed cases before ten judges in the Western District of Pennsylvania for an average of 321 cases per judge and a "weighted filing" score of 329 in the twelve months prior to September 30, 2012. *See* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics.aspx. In comparison, the Eastern District of Virginia had 5,133 filings before eleven judges for an average of 467 cases per judge and a "weighted filing" score of 472 during that same time frame. *Id.* Given that the Eastern District of Virginia is relatively more congested, this factor weighs in favor of retaining

---

No. 13 at ¶¶ 46-47). Waterfront alleges that InScope recruited Scientel for its own purpose to compete against it for the Wireless Waterways project. *Id.* at ¶¶ 67, 81.

the case in this forum.

### 2. Local Interest in Deciding Controversies of Local Interest at Home

Courts have an interest in resolving matters of local interest. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home."). This factor also overlaps with factors already discussed (where the claim arose and the convenience of the parties), *see LG Elecs. Inc. v. First Int'l Computer of Am., Inc.*, 138 F. Supp. 2d 574, 592 (D.N.J. 2001), as well as the factor regarding the public policies of the forum; therefore, the Court limits its focus to the interests of local judges and juries in events in their community.

This matter arises from InScope's alleged disclosure of confidential information, which thwarted Waterfront from obtaining a contract with the Port Commission to build the Wireless Waterways. The Court takes judicial notice that the $1.3 million Wireless Waterways project has been unveiled, which the Port Commission believes will revolutionize industrial and recreational travel on the rivers in the area. *See* $1.3 Million Wireless Broadband Project for Rivers Unveiled, *available at:* http://www.post-gazette.com/stories/business/news/13-million-wireless-broadband-project-for-rivers-unveiled-690762/. This is certainly a topic of interest for the jurists and people of this District. Therefore, this factor favors keeping the action in this District.[6]

---

[6] The Court is also to consider the ease, expediency, and expense of adjudicating the claims in the different venues. *Jumara*, 55 F.3d at 879. This factor can overlap with a number of others and the Court must be careful not to "double count" it. *See Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 205-06 (D. Del. 1998). Because the Court has already considered factors regarding the ease of litigating this action in the Western District of Pennsylvania, the Court declines to consider this factor in order to avoid overlap with the other *Jumara* factors already discussed. *See, e.g.*, *LG Elecs., Inc. v. First Int'l Computer, Inc.*, 138 F. Supp. 2d 574, 592 (D.N.J. 2001) (considering the presence of related cases in one district); *IMS Health, Inc. v. Vality Tech. Inc.*, 59 F. Supp. 2d 454, 470 (E.D. Pa. 1999) (considering court congestion); *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 359 (D. Del. 1999) (declining to consider a party's expense because it was already part of the private factors); *Affymetrix*, 28 F.

**C. The Weight of the *Jumara* Factors**

In summation, there are three *Jumara* factors that favor retaining this action in the Western District of Pennsylvania—the convenience of the non-party witnesses, the relative docket congestion, and the interest in deciding matters that relate to a local project. None of the *Jumara* factors weigh in favor of transferring this case to the Eastern District of Virginia. All of the remaining factors are neutral as to the appropriateness of transferring venue. Accordingly, on balance, the *Jumara* factors weigh against transfer of venue.

**III. Conclusion**

For the foregoing reasons, the Court denies InScope's motion to dismiss or stay this action, without prejudice, to renewing this argument by way of an appropriate motion at the conclusion of limited discovery. In addition, the Court denies InScope's motion to transfer venue.

**ORDER**

IT IS HEREBY ORDERED that InScope's "Motion to Dismiss Amended Complaint, or in the Alternative, to Transfer" [14] is DENIED;

IT IS FURTHER ORDERED that the parties shall conduct limited discovery on issues related to the applicability of the disputed arbitration clause in this case, to end on **September 17, 2013**;

FINALLY, IT IS ORDERED that the Court will conduct a telephone status conference on **Friday, September 20, 2013 at 8:30 a.m.**  The Court will initiate said conference call.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

---

Supp. 2d at 205-206 (declining to consider this factor at all because it overlaps with considerations of docket congestion and party convenience).

Date:   June 14, 2013

cc/ecf:  All counsel of record